IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 28, 2001

**STATE OF TENNESSEE v. GERALD E. SAYLOR**

**Appeal from the Criminal Court for Washington County**
**No. 25854     Lynn W. Brown, Judge**

**No. E2001-00604-CCA-R3-CD   Filed July 11, 2002**

The defendant, Gerald E. Saylor, was convicted by a Washington County Criminal Court jury of voluntary manslaughter, a Class C felony, and the trial court sentenced him as a Range III, persistent offender to fifteen years imprisonment.  The defendant appeals, claiming that: (1) the evidence is insufficient to support his conviction; (2) the trial court erred in denying his motion to suppress his confession; (3) the trial court erred in excluding testimony that several hours before the killing the victim had stated to a third party that he was going to kill the defendant; (4) the trial court erred in excluding testimony to rebut the state's inference that the defendant planted weapons on the victim and that the victim had made prior threats to the defendant; (5) the trial court erred by failing to declare a mistrial when the jury heard references to his being "on parole" and "on the run"; and (6) the trial court erred in its application of enhancement and mitigating factors to his sentence. Although we conclude that enhancement factor (5) regarding exceptional cruelty should not have been applied, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Clifton L. Corker, Johnson City, Tennessee, for the appellant, Gerald E. Saylor.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; Joe C. Crumley, Jr., District Attorney General; and Victor J. Vaughn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant was charged with the second degree murder of John Case.  Johnson City Police Officer Bruce Dowdle testified that on November 3, 1999, he was dispatched to Grover Street.  He said that the dispatcher did not give him a house number and that he parked his car and began walking along Grover Street.  He said that two people, who were covered in blood,

approached him and told him that their friend was inside a house. He said that he went into 904 Grover Street and found the victim lying in a pool of blood in the living room. He said that a hatchet had been shoved down the back of the victim's pants and that an open pocketknife was in the victim's back pants pocket. He said that the victim was alive and that blood and brain matter covered the couch, walls, and floor of the room. He said he and the two people went outside to wait for assistance.

Bryan Williams, an emergency medical technician, testified that on November 3, he was sent to the victim's residence. He said he found the victim lying face down on the floor in a puddle of blood. He said the victim had severe head trauma and was breathing but unresponsive. He said he rolled the victim over and inserted an oral airway to assist the victim's breathing. He said he and a police officer removed a small ax and a pocketknife from the back of the victim's pants.

Johnson City Police Detective Kevin Peters testified that when he arrived at 904 Grover Street, paramedics were working on the victim, who had blood all over his face. He said a bloodstain was on the couch and blood splatter was on the wall behind the couch and the living room ceiling. He said that there had been a scuffle in the kitchen and that kitchen furniture was overturned. He said that he found two mops in the kitchen and that the mops had been used to wipe up blood. He said that a vase in the living room had been broken and that an altercation appeared to have taken place near the living room couch.

Johnson City Police Investigator Larry Brown testified that he was sent to the hospital to take pictures of the victim. He said that when he arrived, the victim was dead. He said the victim was covered with blood, had a large cut across his nose, and had head lacerations. He said the victim also had cuts to the back of his hands and across the palm of his right hand.

Freida Webb testified that on November 3, she was living at the victim's house. She said that she left the home at 11:00 a.m. and that when she returned about 3:00 p.m., the victim, the defendant, Brenda Hull, and Kenneth White were there. She said that tables and a microwave oven had been broken and that when she asked what had happened, the victim told her, "I hit him four times with a hammer as hard as I could." She said that she asked the victim why he had hit the defendant and that the victim told her that he could not control himself. She said that she did not see any blood on the victim or the defendant.

Ms. Webb testified that she was afraid to stay at the victim's home and that she went to Steve Fenner's house. She said that about 3:30 p.m., the defendant came to Mr. Fenner's home. She said the defendant was clean, with no blood on him. She said that about 6:00 p.m., they saw an ambulance go by and that she decided to walk back to the victim's house to get her medication. She said that when she and Mr. Fenner walked to 904 Grover Street, the police were there. She said the police took her to the police station.

Kenneth White testified that on the morning of November 3, he had an argument with his girlfriend and that she took him to the victim's house. He said he had been drinking vodka the night

before and was beginning to sober up when he arrived at the victim's home. He said that the victim was there and that the defendant and Brenda Hull arrived with a half gallon of vodka. He said he, Ms. Hull, the defendant, and the victim drank all of the vodka. He said that he got into an argument with the defendant, that they scuffled in the kitchen, and that he hit the defendant. He said that later in the day, "everything was sort of normal" and that he and the defendant were in the living room. He said that the victim came into the room and that the victim had one hand behind his back. He said that he heard a scuffle and looked over at the victim and the defendant. He said that the victim was holding a hammer and that the defendant had a mark on his face. He said the victim had hit the defendant with the hammer. He said the defendant took the hammer away from the victim and hit the victim in the face and head with it.

Mr. White testified that the victim fell onto the couch and was barely moving. He said he ran next door to telephone the police but that no one was home. He said he ran back to the victim's home and saw a hatchet in the back of the victim's pants. He said the defendant was gone. He said that the victim was lying on the living room floor and that Ms. Hull was holding the victim. He said he and Ms. Hull went to another house and telephoned 9-1-1. He said he and Ms. Hull went back to the victim's house and waited for the police.

On cross-examination, Mr. White testified that before the killing, the victim and Ms. Hull had argued in the kitchen and that the victim had ripped an earring out of Ms. Hull's ear. He acknowledged that earlier in the day, the victim had told him and the defendant to leave the house. However, he said that before they left, the victim changed his mind and asked them to stay at the home. He said that before the victim attacked the defendant, the defendant did not have a weapon or threaten the victim. He said the victim approached the defendant in the living room and suddenly hit the defendant on the head with the hammer. He said that the fight was over within seconds and that the victim fell back onto the couch. He said the defendant did not hit the victim while the victim was on the couch.

On redirect examination, Mr. White acknowledged that he did not see the victim pull the earring out of Ms. Hull's ear. He said that as the defendant was hitting the victim, the victim was holding up his hands. He said that before the incident in question, he had not seen the victim with a hatchet or a knife.

Brenda Hull testified that in November 1999, she was living in the victim's house with the defendant, the victim, and Freida Webb. She said the defendant was her boyfriend. She said that on November 3, she and the defendant awoke about 9:00 a.m. and began drinking beer with the victim and Kenneth White about 11:00 a.m. She said that at 1:00 p.m., she and the defendant went to the liquor store and bought vodka. She said that they went back to the victim's house and that everyone drank heavily. She said that about 6:00 p.m., she and the defendant left the house again. She said she went to the store to buy cigarettes while the defendant went to Steve Fenner's home to use the telephone. She said that when she returned to the victim's house, the defendant was not there. She said that when the defendant returned from Mr. Fenner's house, he and the victim went into the kitchen. She said she went in the kitchen to see what was happening and saw that the victim

had hit the side of the defendant's head with a hatchet or a hammer. She said the defendant staggered and fell. She said the defendant got up, picked up the hatchet, and hit the victim. She said the victim fell and did not get up. She said that she begged the defendant to stop hitting the victim and that Kenneth White held her back from the defendant.

Ms. Hull testified that Mr. White and the defendant had argued earlier in the day but that she had not seen them physically fight. She denied that the victim ripped the earring out of her ear and said that Mr. White tore the earring out while he was holding her back from the defendant. She said the defendant hit the victim several times with the hatchet and then handed it to her. She said she dropped the hatchet and blacked out. She said that when she awoke, the victim was lying in the living room and that blood was everywhere. She said that the defendant was gone and that she held the victim and tried to wake him. She said she did not see a hatchet in the victim's pants while he was lying on the floor. She said that she did not try to clean up the blood and that she did not see anyone using a mop. She said the police took her to the police station and questioned her. She said that later, the police took her and the defendant to the hospital. She said that at the hospital, the defendant told her that the victim "would never hit no one else in the head with a hammer."

On cross-examination, Ms. Hull acknowledged that she and the victim were drunk on November 3. She denied that the victim threw her onto the kitchen table, and she said that she did not know how the kitchen table got broken. She said that she had not seen the defendant with a knife, hatchet, or any other weapon that day and that she did not know why the victim had hit the defendant. She acknowledged telling the police that she found the beaten victim when she returned from buying cigarettes and that she was not at the house when the defendant hit the victim. She said, however, that she made those statements because she was scared.

Steve Fenner testified that he lived about one block from the victim's house. He said that on November 3, 1999, he was at his apartment with Freida Webb and that the defendant came to his home and told him that two African-American men were looking for the victim. He said Ms. Webb wanted to walk back to the victim's house in order to get her medication. He said that the defendant would not go with Ms. Webb and that the defendant asked him to walk with her. He said that before he and Ms. Webb left his apartment, the defendant told him to tell any police officers that two African-American men were looking for the victim. He said that he and Ms. Webb walked to the victim's house and that the police were there. He said the police took him and Ms. Webb to the police station for questioning. He said that when he returned to his apartment, his wife told him that the defendant was hiding in their closet. He said that his wife told police about the defendant being in the apartment and that the police arrested the defendant.

Joe Minor, a forensic scientist with the Tennessee Bureau of Investigation (TBI), testified that he performed blood tests on various items that police took from the crime scene. He said that he found the victim's blood on a kitchen mop, a paper towel, a sample of the living room ceiling, and clothing that Ms. Hull, Mr. White, and the defendant were wearing at the time of the killing. He said there were no bloodstains on the hatchet.

Johnson City Police Lieutenant Debbie Barron testified that she went to the victim's home and saw the victim lying on the living room floor. She said that items in the room were broken and turned over and that there had been a scuffle in the room. She said blood was on the couch and the wall behind the couch. She said she went back to the police department to interview witnesses.

Lieutenant Barron testified that the defendant waived his rights and that she interviewed him on videotape about 8:45 p.m. She said that he was nervous and that she could smell alcohol on his person. She said the defendant was clean except for one speck of blood on his pants. On cross-examination, she said that witnesses told her that the victim was known for carrying a hatchet. She acknowledged that after the interview, a blood test revealed that the defendant's blood alcohol content was .17%.

The defendant's videotaped interview was played for the jury. On the tape, the defendant said he, the victim, Brenda Hull, and Kenneth White were drinking at the victim's house. He said that Ms. Hull "got wild" and the victim started slapping her. He said that he and Mr. White tried to stop the victim and that the victim stated, "Don't make me go get my hatchet." He said that the victim broke items in the house and that the victim made him and Mr. White leave the home. He said that he and Mr. White went back to the victim's house and that as he was standing at the door, the victim hit him in the head with a hammer. He said he defended himself by snatching the hammer away from the victim and hitting the victim with it. He said that after hitting the victim, he left the house. He said that he did not remember how many times he hit the victim but stated that he hit the victim "probably too much." The defendant also stated, "I might have lost control."

Dr. Murray Marks, a forensic anthropologist, testified that he examined the victim's skull. He said that the victim's nose had been broken and that the victim had been hit in the head at least six times. He said the fact that the victim's skull was completely broken showed that the defendant hit the victim with a blunt object and with a large amount of force.

Dr. Ellen Wallen testified that she performed the victim's autopsy. She said the victim had injuries to his nose and the left side of his face. She said the victim suffered multiple skull fractures, brain lacerations, and brain contusions. She concluded that the victim died of multiple "chop wounds" to his head and that the wounds were consistent with wounds produced by a hatchet. She said that the victim also had defensive wounds to his right hand. She testified that the autopsy revealed the victim's blood alcohol level was 0.275%. On cross-examination, she said that it was possible that the victim remained standing while the defendant was hitting him. However, on redirect, she said she could not rule out the possibility that the defendant continued to hit the victim after the victim fell onto the couch.

The defense called Joseph Malone, who testified that he lived with the victim, the defendant, and Ms. Hull in 1999. He said he moved out of the victim's house about one week before the killing. He said the defendant and the victim were friends. He said that the defendant previously had dated a girl that the victim was dating and that this appeared to bother the victim. He said that

while he was living with the victim and the defendant, he heard the victim tell the defendant that the victim could make a person go to sleep by putting the person in a headlock.

Ruthie Hall testified that she owned Mom's Taxi and Limo and that the victim came to her business about 1:55 p.m. on November 3, 1999. She said that the victim had a bloody handkerchief wrapped around his hand and that he wanted a taxicab. The jury convicted the defendant of voluntary manslaughter.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support his conviction. He contends that the proof showed that he acted in self-defense. The state contends that the evidence is sufficient. We agree with the state.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Tennessee's self-defense statute, Tenn. Code Ann. § 39-11-611(a), provides as follows:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

The state has the burden of negating any defense raised by supporting evidence. See Tenn. Code Ann. § 39-11-201.

The evidence at trial showed that the defendant had done nothing to provoke the victim's initial attack and that the victim was the first aggressor. However, the proof also showed that the defendant took the weapon away from the victim and repeatedly hit the victim in the face and head with enough force to break the victim's skull and splatter blood and brain matter around the room. Viewed in the light most favorable to the state, the evidence justified the jury's conclusion that the victim adequately provoked the defendant but that the severity of the defendant's response went beyond that necessary to defend himself. We hold that the state sufficiently overcame the defendant's self-defense claim and that the evidence is sufficient to convict the defendant of voluntary manslaughter.

## II. MOTION TO SUPPRESS

The defendant contends that the trial court erred in denying his motion to suppress his confession. He contends that his videotaped confession was inadmissible because (1) he had made an unequivocal request for an attorney, and (2) even if his request for an attorney was equivocal, the police should have clarified his request prior to questioning him. The state claims that the trial court correctly determined that the defendant never clearly invoked his right to counsel and, therefore, that the police were under no obligation to stop questioning him. We believe that the defendant's videotaped statement was admissible.

We have reviewed the videotape, which began by showing the defendant handcuffed and in a police interview room. An unidentified police officer was in the room but off camera, and the following exchange occurred:

Defendant:   [Inaudible.]

Officer:   You're arrested ain't you?

Defendant:   For what?

Officer:   We'll let you know in a minute.

Defendant:   People, I haven't done nothing. Only thing I can figure is that I've violated my parole. That's the only thing I can figure. That's about the only thing I can figure.

Officer:   What are you on parole for?

Defendant:   Well . . . I guess it don't matter until I can get a lawyer present.

Officer:   It don't make any difference to me.

| | |
|---|---|
| Defendant: | I'm supposed to have a lawyer, though, don't I? |
| Officer: | Hmmm? |
| Defendant: | I have to have a lawyer present, I reckon'. Before you ask me. That's the story, isn't it? |
| Officer: | What's that? |
| Defendant: | You have to have a lawyer present before questioning. |
| Officer: | I ain't asked you no questions! |
| Defendant: | That's right. |

 . . . .

About ten minutes later, Lieutenant Barron entered the interview room and read the defendant his <u>Miranda</u> rights. She then asked the defendant to sign a waiver of rights form, and the following exchange occurred:

| | |
|---|---|
| Defendant: | But I'll talk to you, but I don't want to waive my rights. I'll sign it, but what I'm saying is . . . |
| Barron: | Well, your basically, if you sign that you are waiving your rights. |
| Defendant: | But I haven't done nothing is what I'm trying to tell you. |
| Barron: | Well if you haven't done anything, then you don't need a lawyer, right? |
| Defendant: | No. I might need a lawyer because somebody might try to accuse me of something I didn't do. |
| Barron: | Well, I will too. I don't know. I can't make any promises. If you sign that, you're waiving your rights. I mean, that's what it says right there. |
| Defendant: | No, I don't need to do that, do I? Of course, I haven't done anything, but . . . and I can stop at any time, right? |

Barron: You can stop anytime you want to.

[Defendant appears to sign form.]

Defendant: I shouldn't have done that really. Of course, I haven't done anything.

The defendant then told Lieutenant Barron that the victim hit him with a hammer, that he "snapped," and that he took the hammer away from the victim and hit the victim with it.

The defendant filed a motion to suppress his confession on the grounds that he made an unequivocal request for an attorney and that even if his request was equivocal, the police were obligated to clarify the request before questioning him. At the suppression hearing, Lieutenant Barron testified that she was not in the interview room while the other police officer was in the room. She said that when she went into the interview room, she read the defendant his Miranda rights and that he appeared to understand them. She said that she was the only officer to question the defendant and that she did not threaten or coerce him into talking to her. During cross-examination, the defense played the beginning of the videotape for Lieutenant Barron. She said that she had been unaware of the conversation between the unidentified officer and the defendant.

The trial court denied the motion to suppress, finding that the defendant made an equivocal request for an attorney and that the police were under no duty to clarify his request. In its ruling, the trial court also noted that at the time the defendant made his equivocal request for counsel, he was not being interrogated by the police.

A trial court's decision on a motion to suppress will be upheld unless the evidence in the record preponderates against it. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Also, questions of the "credibility of the witnesses, the weight and value of the evidence, and the resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. The prevailing party "is entitled to the strongest legitimate view of the evidence . . . as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id.

Initially, we disagree with the trial court's intimation that at the time the defendant made his "equivocal" request for counsel, he was not being interrogated. A defendant does not have to wait for the police to advise him of his Miranda rights or to interrogate him before he can invoke his Fifth Amendment right to counsel. See McNeil v. Wisconsin, 501 U.S. 171, 178, 111 S. Ct. 2204, 2209 (1991) (holding that the Fifth Amendment requires, "at minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police"); United States v. Kelsey, 951 F.2d 1196, 1199 (10th Cir. 1991) (providing that the fact that the defendant invoked his right to counsel before the police were required to Mirandize him was irrelevant when the defendant was in custody and it was clear that the police intended to question him); People v. Villalobos, 737 N.E.2d 639, 646 (Ill. 2000) (holding that in order "to invoke the Miranda right to counsel, an individual must be both in custody and

subject to interrogation or under imminent threat of interrogation"); State v. Torres, 412 S.E.2d 20, (N.C. 1992) (providing that "[i]t would make little sense to require a defendant already in custody to wait until the onset of questioning or the recitation of her Miranda rights before being permitted to invoke her right to counsel").

Regarding the trial court's concluding that the police need not clarify an equivocal request for an attorney, our supreme court has previously held under the United States and Tennessee Constitutions that when a suspect makes an "ambiguous or equivocal request for counsel, further questions by officers thereafter must be limited to clarifying the suspect's desire for an attorney." State v. Stephenson, 878 S.W.2d 530, 548 (Tenn. 1994). Subsequently, the United States Supreme Court concluded that procedural safeguards under the Fifth Amendment to the United States Constitution do not require that an officer stop questioning upon an ambiguous invocation of the suspect's right to counsel. Davis v. United States, 512 U.S. 452, 460-61, 114 S. Ct. 2350, 2355 (1994). Then, in State v. Huddleston, 924 S.W.2d 666, 669 (Tenn. 1996), our supreme court concluded in light of Davis that the Fifth Amendment did not require a cease in questioning if a defendant made only an equivocal or ambiguous request for an attorney. However, the court did not refer to Stephenson or to the state constitution. In any event, in several cases, this court has interpreted Huddleston as overruling Stephenson relative to the effect of an equivocal request for an attorney under the Tennessee Constitution. See, e.g., State v. James Clayton Young, Jr., No. 01C01-9605-CC-00208, Rutherford County (Tenn. Crim. App. May 22, 1998); State v. Jack Jay North, Jr., No. 02C01-9512-CC-00369, Hardin County (Tenn. Crim. App. Dec. 9, 1996), app. denied (Tenn. July 7, 1997). We believe, however, that regardless of the standard applied under our state constitution, the defendant's claim fails.

The evidence shows that the defendant was under arrest and sitting in the police interview room at the time of his conversation with the unidentified police officer. The defendant obviously knew that the police were preparing to question him and, in anticipation of that questioning, made equivocal statements to the officer regarding obtaining an attorney. Later, when Lieutenant Barron entered the interrogation room and read the defendant his rights, she was unaware of his statements to the unidentified officer and asked the defendant to sign a waiver of rights form. The defendant then told her that he did not want to waive his rights and stated that he might need a lawyer, which was another equivocal request for counsel. Lieutenant Barron explained to the defendant that he would be waiving his rights if he signed the form, and the defendant decided to sign it. Under these facts, we conclude that the evidence does not preponderate against the trial court's finding that the defendant's statements were equivocal requests for an attorney. Moreover, we conclude that the record reflects that Lieutenant Barron clarified the defendant's request and that the defendant decided not to have an attorney present during questioning. Thus, the defendant's videotaped statement was admissible at trial.

### III. EXCLUSION OF RUTHIE HALL'S TESTIMONY

The defendant claims that the trial court erred in excluding testimony by Ruthie Hall that while the victim was at her taxi business on the afternoon of November 3, 1999, he told her that he

was going to kill the defendant. The defendant contends that the victim's statement was relevant to the self-defense claim and that the statement was admissible under the state of mind exception, Tenn. R. Evid. 803(3), to the hearsay rule to show that the victim intended to kill the defendant with the hammer. The state claims that the trial court properly excluded Ms. Hall's proposed testimony because the victim's threat was never communicated to the defendant and, therefore, was not relevant to his self-defense claim. We believe that the trial court properly excluded the testimony.

Generally, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). However, this evidence may be admitted for other purposes if relevant to some matter actually in issue in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993). For example, in State v. Ruane, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995), this court stated that a victim's prior bad act may be admissible to show that the defendant feared the victim. However, this court also stated that if the defendant is unaware of the victim's prior bad act, then the evidence is admissible for the limited purpose of corroborating the defendant's claim that the victim was the first aggressor. Id.

In this case, we believe that Ms. Hall's testimony about the victim's threat to kill the defendant was inadmissible. The state stipulated to the fact that the victim was the first aggressor. Thus, the defendant did not need Ms. Hall's testimony to corroborate his claim that the victim attacked him. As to the defendant's argument that the testimony was necessary to show the jury that the victim intended to inflict severe harm on him, we believe that evidence of the victim suddenly attacking the defendant with the hammer and hitting the defendant in the head demonstrated to the jury that the victim intended to cause severe harm. We conclude that the trial court properly excluded the testimony.

### IV. EXCLUSION OF JOSEPH MALONE'S TESTIMONY

The defendant also claims that the trial court erred by excluding portions of Joseph Malone's testimony. First, he contends that Mr. Malone should have been allowed to testify that he knew the victim to carry a knife in his back pocket. According to the defendant, this testimony was admissible to rebut the state's inference that the defendant planted the knife on the victim after the killing. Second, the defendant contends that Mr. Malone should have been allowed to testify that he saw the victim show the defendant how to hold the knife to keep it from being knocked out of one's hand. The defendant contends that this testimony was relevant as a prior threat made by the victim to the defendant. Finally, the defendant claims that Mr. Malone should have been allowed to testify that sometime before the day of the murder, he heard the victim tell the defendant that the victim could put the defendant "to sleep, or he could take him out." The defendant claims that this evidence also was relevant as a prior threat made by the victim to the defendant.

In a jury-out hearing, the trial court ruled that Mr. Malone's testimony regarding the victim's carrying a knife in his back pocket and showing the defendant how to hold the knife was irrelevant

because there was no evidence that a knife was used by either party during the offense in question. As for Mr. Malone's testimony regarding the victim's threat "to take the defendant out," the trial court ruled that the testimony was relevant to the defendant's state of mind and allowed the defense to introduce that evidence.

According to Rule 401, Tenn. R. Evid., evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Tenn. R. Evid. 403. The trial court has discretion in determining whether evidence meets the test for relevancy. State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). Assessing the probative value and danger of unfair prejudice regarding the evidence also falls within the trial court's discretion. State v. Burlison, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993). This court will only reverse a trial court's decision if the trial court abused its discretion. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995).

Initially, we note that the trial court ruled that Mr. Malone's testimony about hearing the victim tell the defendant that he could take the defendant out was admissible. Furthermore, the record reveals that Mr. Malone testified during direct examination and without objection that he heard the victim tell the defendant, "I can take a person and put them in a headlock and put them asleep . . . ." Therefore, there is no basis for the defendant's claim that the trial court improperly excluded this testimony.

As to Mr. Malone's testimony about the knife, we do not believe that the trial court abused its discretion in ruling that testimony about the victim showing the defendant how to hold the knife was inadmissible. No evidence was presented to show that the victim was holding a knife when he attacked the defendant or that he pulled a knife on the defendant as the defendant was hitting him with the hammer. Therefore, we cannot conclude that the trial court improperly excluded the testimony. However, we agree with the defendant's contention that Mr. Malone should have been allowed to testify that he knew the victim to carry a knife in his back pocket. Officer Bruce Dowdle testified that he found a hatchet that had been "shoved down" the back of the victim's pants and an open knife in the victim's back pocket. Furthermore, the state elicited from several of its witnesses that they had not seen the victim with a hatchet or a knife on November 3. Thus, the state's evidence inferred that the defendant planted the weapons on the victim after he killed the victim, and the defendant should have been allowed to rebut that inference with Mr. Malone's testimony. Nonetheless, considering the whole record, we cannot say that the error more probably than not affected the judgment in this case. See T.R.A.P. 36(b).

## V. MISTRIAL

Next, the defendant claims that the trial court erred by failing to grant a mistrial when the jury heard the defendant say in his videotaped statement that he was "on parole" and "on the run." The state claims that because the defendant did not replay the statements for the trial court per the

trial court's request at trial, the defendant has waived the issue. In addition, the state claims that any error did not rise to the level of manifest necessity to justify a mistrial. We believe that the trial court did not abuse its discretion in failing to grant the defendant's request for a mistrial.

In a pretrial hearing, the defense asked that the defendant's statements regarding his being "on parole" and "on the run" be redacted from the videotape, and the state agreed to redact those statements from the tape. However, when the state played the videotape for the jury during Lieutenant Barron's testimony, the statements remained in the tape. Immediately after each statement, the videotape jumped as if someone had tried to edit it. After the state played the tape for the jury, a bench conference was held and the following exchange occurred:

| | |
|---|---|
| [Defense]: | I was a little concerned when he said he was on the run. I thought we'd cut that out. |
| THE COURT: | On the run? |
| [Defense]: | It sounded like he said that. |
| THE COURT: | I didn't -- I didn't hear that. |
| [State]: | I didn't hear that. |
| THE COURT: | That would have been -- that would have been relevant. |
| [Defense]: | I think he said I was on the run, and I thought I heard the word parole, and we tried to get that out. |
| THE COURT: | All right. I'll just tell the jury that you want to take a break. |
| . . . . | |
| [Defense]: | I think probably just to protect the record there if there was a mention of the word parole, that was supposed to have been edited out, and . . . |
| THE COURT: | I didn't hear it. |
| . . . . | |

-13-

| [Defense]: | And for that reason I think -- I don't know if -- I guess for the protection of the record. I know it was an hour and twenty minute interview almost. It may be lost, but I think just for the -- I mean, I think I'm obligated to say mistrial, Your Honor . . . . |
|---|---|

. . . .

The trial court offered to give the jury a curative instruction. However, the defense, afraid that a curative instruction would draw the jury's attention to the defendant's statements, asked that the court not give an instruction. As to the defense's request for a mistrial, the trial court asked that the defense find and replay the defendant's statements in order for the trial court to determine whether manifest necessity required granting the defendant's mistrial request. However, the defense did not replay the videotape for the trial court.

In his motion for new trial, the defendant argued that the trial court erred by not granting his request for a mistrial. The defense finally replayed the defendant's videotaped statements for the trial court, and the trial court held that although it was error to allow the jury to hear the statements, the error did not rise to the standard of manifest necessity to justify granting a mistrial.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only if there is a manifest necessity for such action. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). This court will not disturb that decision unless there is an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990); State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

We hold that the trial court did not abuse its discretion in finding that the unredacted videotape did not warrant declaring a mistrial. The record reflects that after viewing the videotape, the trial court, the defense, and the state disagreed as to what they heard on the videotape, and the record does not reflect whether the jury heard the defendant's statements. The defendant has shown no manifest necessity that would require a mistrial, and he is not entitled to relief.

## VI. SENTENCING

Finally, the defendant claims that the trial court improperly sentenced him to the maximum sentence of fifteen years for a Range III, Class C felon. Specifically, he contends that the trial court erred in applying enhancement factor (5), that the defendant treated or allowed the victim to be treated with exceptional cruelty during the offense, and that the trial court failed to afford proper weight to the applicable mitigating factor. The state claims that the trial court properly enhanced the defendant's sentence. We agree with the state.

-14-

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. Tenn. Code Ann. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The sentence to be imposed by the trial court for a Class C felony is presumptively the minimum in the range when there are no enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Tenn. Code Ann. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

The presentence report reflects that the then thirty-six-year-old defendant quit high school but later earned his G.E.D. The defendant reported fair physical health and good mental health and stated that he began using alcohol when he was sixteen years old. The report reflects that the

defendant had been convicted of various felonies and misdemeanors, including rape; theft of property valued more than $1,000 but less than $10,000; sale of a Schedule II drug; breaking and entering; passing a forged prescription; driving with a revoked license; and public intoxication.

The trial court found the following enhancement factors applicable, as listed in Tenn. Code Ann. § 40-35-114:

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
>
> . . .
>
> (5) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;
>
> . . .
>
> (9) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense; [and]
>
> . . .
>
> (13) The felony was committed while [the defendant was on parole.]

In mitigation, the trial court considered that the defendant, "although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the conduct." Tenn. Code Ann. § 40-35-113(11). The trial court gave little weight to the mitigating factor and determined that there were more than enough enhancement factors to justify increasing the defendant's sentence to the maximum within the range, fifteen years.

The defendant contends that the trial court erred by enhancing his sentence based upon the exceptional cruelty factor. The state contends that the enhancement factor applies because the defendant inflicted multiple blows that penetrated the victim's skull and because he continued to hit the victim after the victim had collapsed. The application of factor (5) requires "exceptional cruelty," which is usually found in cases of abuse or torture. See State v. Williams, 920 S.W.2d 247, 250 (Tenn. Crim. App. 1995). Our supreme court has held that the facts must "support a finding of 'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to'" the crime. State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997) (quoting State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994)). In other words, the proper application of this factor requires a finding of cruelty "over and above" what is required for the offense itself. State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001).

The evidence reveals that the defendant hit the victim at least six times with a hammer with enough force to break the victim's skull and splatter his blood and brain matter around the room. The defendant continued to hit the victim as the victim tried to defend himself from the blows. However, the pathologist attributed the victim's death to "multiple" blows and the trial court acknowledged that the event happened quickly. The evidence also reflects that the victim lost consciousness. The state asserts that this court has recognized that exceptional cruelty is applicable in a murder case in which the victim sustained traumatic and severe damage to the head, citing State v. Gray, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997). In Gray, the defendant severely beat his fiancee to death, and the victim had many external injuries including a laceration on her scalp, abrasions above her right eye, on her back and right side, on her hip bone and on her thighs, bruises on her breasts, and marks on her forearms and wrists. The victim also had a fractured skull and several internal injuries including hemorrhaging of the small bowel and left breast. We believe that the facts in the present case are quite distinguishable from those in Gray. The trial court applied enhancement factor (5) because the defendant inflicted multiple blows, "any of several which could have caused his death." As previously noted, though, the pathologist attributed the death to several blows and the evidence reflected that they were administered in quick fashion. We conclude that the circumstances in this case do not justify a finding of exceptional cruelty over and above the actions causing the victim's death.

As for the defendant's claim that the trial court failed to give proper weight to the mitigating factor, we note that the weight accorded sentencing factors is left to the trial court's sound decision. See Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments. In this case, the trial court determined that the mitigation proof was so minimal that it should not decrease the sentence from the maximum in the range. We believe material evidence exists to support this determination.

Moreover, although we conclude that enhancement factor (5) was inappropriately applied, we are impressed with the seriousness of the remaining enhancement factors. The defendant's being on parole, having a substantial criminal record, and using a deadly weapon in the manner he did justify a maximum sentence, even in the face of mitigation from the unusual circumstances surrounding the defendant's conduct. We conclude that the sentence imposed by the trial court is appropriate.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE

-17-